UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

RODNEY HENRY

                                          Plaintiff,

-against-

THE CITY OF NEW YORK, DETECTIVE KEITH
D'SOUZA, SHIELD NO. 02106, DETECTIVE
ELIZABETH DELAROSA, SHIELD NO. 05742,
DETECTIVE MICHAEL CARRERAS, SHIELD NO.
1432, DETECTIVE VICTOR SADARANGANI, SHIELD
NO. 24066, DETECTIVE ANDREW CERASE, SHIELD
NO. 18028, DETECTIVE BRIAN MACARTHUR,
SHIELD NO. 02073

                                      Defendants.

----------------------------------------------------------------------- x

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND**

19-cv-00021-NGG-RLM

## <u>PRELIMINARY STATEMENT</u>

1.    This is a civil rights action in which plaintiff seeks relief for the violation of his rights secured by 42 USC §1983 and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York.

2.    The claims arise from a Feb 16, 2016 incident, in which Officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected plaintiff to false arrest.

3.    Plaintiff seek monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## <u>JURISDICTION</u>

4.    This action is brought pursuant to 28 U.S.C. §1331, 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

5.      Venue is laid within the United States District Court for the Eastern District of New York in that Defendant City of New York is located within, and the events occurred within, the boundaries of the Eastern District of New York.

## PARTIES

6.      Plaintiff Rodney Henry is a resident of New York County in the State of New York.

7.      The City of New York (or "the City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

8.      Detective Keith D'Souza, Shield No. 02106, Detective Elizabeth Delarosa, Shield No. 05742, Detective Michael Carreras, Shield No. 01432,  Detective Victor Sadarangani, Shield No. 24066, Detective Andrew Cerase, Shield No. 18028, and Detective Brian Macarthur, Shield No. 02073 were at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agent, servant and employee of the City of New York.  On information and belief, defendants D'Souza, Delarosa, Carreras, Sadarangani,  Cerase, and Macarthur were personally involved in the illegal arrest of plaintiff and/or failed to intervene in the actions of their fellow officers.  Defendants D'Souza, Delarosa, Carreras, Sadarangani,  Cerase, and Macarthur are sued in their individual capacity.

9.      At all times here mentioned defendants were acting under color of state law, to wit,

under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

10.  On or about September 12, 2014, the owner of Queens Hand Car Wash and Detail reported to police officers of the 108th police precinct that fraudulent checks had been drawn from the business' Bank of America banking account.

11.  Defendant Detective Delarosa was assigned to investigate this complaint.

12.  Det. Delarosa worked with Bank of America's Fraud Investigator to learn more about the person who cashed the allegedly fraudulent checks.

13.  On or about December 5, 2014 Delarosa learned from communications with Bank of America, and/or from review of bank records, that the checks were cashed by a Bank of America customer named Rodney Henry. Delarosa also learned the date of birth, social security number, home address, and physical description of the customer who cashed the checks.

14.  Although plaintiff shares the same name as the man who cashed the checks, it was obvious that they were two different men. Their dates of birth did not match, nor did their social security numbers. The check casher was also reported to live at a specific New Jersey address, while plaintiff has never lived in New Jersey.

15.  On December 5, 2014 Det. Delarosa issued an "i-card" for Rodney Henry, reflecting the date of birth, social security number, and New Jersey address which belonged to the man who cashed the checks.

16.  The i-card indicated to police officers that the man described therein was "wanted", and reflected Det. Delarosa's conclusion that there was probable cause to arrest the man described therein.

17.   Det. Delarosa attempted to have the man described in the i-card arrested, but was unable to obtain his arrest in New Jersey.

18.   On March 20, 2015 this investigation was reassigned to Det. D'Souza.

19.   Det. D'Souza conferred with Det. Carreras regarding arrest of the man described in the i-card.

20.   On April 20, 2015 D'Souza was told by Carreras that the man could not be arrested by the NYPD in New Jersey.

21.   Over the next year Det. D'Souza repeatedly worked with Det. Carreras to attempt to arrest the man described in the i-card, but was unable to do so.

22.   On December 23, 2015 Det. D'Souza conferred with an Assistant District Attorney regarding the matter, and was told that the District Attorney's office could not issue a warrant for the man described in the i-card to be arrested in New Jersey.

23.   On February 16, 2016, police officers of the New York Police Department attempted to arrest plaintiff regarding the i-card issued for the other man named Rodney Henry.

24.   Upon information and belief, defendants D'Souza, Carreras, Sadarangani,  Cerase, and Macarthur were personally involved in the decision to arrest plaintiff, and/or personally participated in the apprehension of plaintiff, and/or personally participated in the questioning of plaintiff at the police precinct, and/or the decision to recommend charges against him, and/or the processing of his arrest.

25.   Defendants D'Souza, Carreras, Sadarangani,  Cerase, and Macarthur were aware that plaintiff's date of birth, social security number, and address did not match the man described in the i-card, and the related Bank of America records. They were also aware he did not match the physical description provided in the i-card.

26.   Defendants D'Souza, Carreras, Sadarangani, Cerase, and/or Macarthur first came to plaintiff's home to arrest him. When they discovered he was not home they went to his place of business.

27.   Defendants D'Souza, Carreras, Sadarangani, Cerase, and/or Macarthur then arrested plaintiff at his place of business.

28.   Plaintiff was taken to the 108th precinct. At the 108th Precinct Defendant D'Souza attempted to question plaintiff, but ceased questioning when plaintiff invoked his right to counsel.

29.   D'Souza was attempting to question plaintiff regarding the complaint filed by Queens Hand Car Wash and Detail. D'Souza was aware at this time that the i-card and underlying bank records referenced the other man named Rodney Henry, and that plaintiff's personal information did not match the "wanted" man.

30.   Following the attempt to question plaintiff, D'Souza processed plaintiff for arrest regarding the complaint filed by Queens Hand Car Wash and Detail, forwarded information regarding plaintiff and that complaint to the District Attorney's office, and recommended criminal charges be brought against plaintiff regarding that complaint.

31.   Plaintiff was eventually taken to Queens Criminal Court to await arraignment.

32.   Defendants were aware that the i-card was for a different man, who was unable to be arrested because he resided out of state.

33.   Det. Delarosa reported to Det. D'Souza that she had viewed video footage of the man who cashed the checks, and that plaintiff was the same man.

34.   Delarosa's claim that plaintiff was the man she saw depicted in video footage was false. Plaintiff was never depicted in video footage depositing the allegedly fraudulent checks.

5

35.   Det. Delarosa understood that her identification of plaintiff as the man depicted in video footage would be conveyed to prosecutors, and used to prosecute plaintiff.

36.   Det. D'Souza conveyed Det. Delarosa's false identification to the District Attorney's office, knowing it to be false.

37.   Plaintiff was charged with grand larceny in the third degree, and four counts of possession of a forged instrument.

38.   In the afternoon of Feb 17, 2016, Plaintiff was arraigned, and released on his own recognizance. Plaintiff spent approximately 26 hours in police custody prior to arraignment.

39.   Plaintiff appeared in Queens County Criminal Court in relation to these charges approximately five times.

40.   On November 10, 2016 all charges against plaintiff were dismissed.

41.   Defendants lacked probable cause or reasonable suspicion to believe plaintiff had been involved in any illegal activity.

42.   During all of the events above described, defendants acted maliciously and with intent to injure plaintiff.

## DAMAGES

43.   As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

a.   Violation of his rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution to be free from an unreasonable search and seizure;

b.   Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

c.   Loss of liberty;

d.      Economic loss.

## FIRST CAUSE OF ACTION
(42 U.S.C. § 1983 – as to Individual Defendants)

44.    The above paragraphs are here incorporated by reference.

45.    Defendants have deprived plaintiff of his civil, constitutional and statutory rights under color of law and have conspired to deprive him of such rights and are liable to plaintiff under 42 USC § 1983.

46.    Defendants Defendants D'Souza, Carreras, Sadarangani, Cerase, and/or Macarthur arrested and prosecuted plaintiff without probable cause. By doing so, these defendants falsely arrested and maliciously prosecuted plaintiff, depriving him of his right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.  Defendants' conduct also deprived plaintiff of his right to due process of law, pursuant to the Fourteenth Amendment of the United States Constitution.

47.    Defendants Delarosa and D'Souza were aware or should have been aware that they presented false information to the District Attorney's Office which they knew would be used to prosecute plaintiff.  As a result of those false statements, plaintiff was charged with offenses he had not committed. Defendants' conduct therefore deprived plaintiff of his right to a fair trial, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

48.    Moreover, each of the individually named defendants failed to intervene in each other's obviously illegal actions.

49.    Plaintiff has been damaged as a result of defendants' wrongful acts.

## SECOND CAUSE OF ACTION
(42 U.S.C. § 1983 – Municipal Liability)

50. The above paragraphs are here incorporated by reference.

51. The City is liable for the damages suffered by Plaintiff because, after learning of its employees' repeated violations of New Yorkers' constitutional rights, the City has: failed to remedy the wrong; created a policy or custom under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful events. The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct. By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

52. On numerous occasions over the span of many years, the City of New York has been alerted to the frequency of false arrests charges brought by its police officers. Despite having acquired such knowledge, the City has refused to appropriately sanction its employees' illegal behavior.

53. The City's deliberate indifference to civil rights violations committed by individual police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct, has caused the constitutional violations against Plaintiff in this case.

**THE CITY FAILS TO TRACK LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE OF CIVIL RIGHTS ACTIONS**

54. The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize citizens without

probable cause, bring charges against citizens with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

55. It is well documented that the number of claims against the NYPD has doubled in recent years and has cost taxpayers more than $1 billion.[1]  Despite these staggering figures, the City has repeatedly resisted attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD.  Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data.[2]

56. Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct.  *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v.*

---

[1] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD); Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014,   http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html   (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

[2] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases.  A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

*Piphus,* 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

57. However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court.  By failing to keep track of this crucial data – which could save lives as well as taxpayer money – the City has created a system in which lawsuits are severed from any potential deterrent effect.

**THE CITY FAILS TO HOLD POLICE OFFICERS PERSONALLY FINANCIALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY**

58. The City of New York is also liable in this case because, by habitually indemnifying police officers who have acted unconstitutionally, the City isolates such officers from accountability.[3]  The effect – yet again – is that civil rights lawsuits do not serve a deterrent purpose.   "It is almost axiomatic that the threat of damages has a deterrent effect, *surely particularly so when the individual official faces personal financial liability*." *Carlson v. Green*, 446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

59. Furthermore, civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily not even noted in an officer's personnel file.[4]

---

[3] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014, http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against police officers).

[4] Association of the Bar of the City of New York, Committee on New York City Affairs, "The

60. For decades, the City has been on notice that certain officers and precincts are disproportionately responsibility for civil rights lawsuit liability.  Nonetheless, the City has failed to take action to hold officers or precincts accountable, and has failed to investigate to what extent certain officers, units, and precincts are disproportionately responsible.

61. In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even substantial ones – and NYPD discipline of officers.[5]  Hevesi continued:

> As a result, the NYPD does not learn of potential problem officers, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation, resulting in harm to another person and further damages from the City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[6]

62. The Comptroller recommended that the police department "analyze . . . settled claims, and take steps to review the officers' performance and propensity to" violate New Yorkers' civil rights.[7]

63. The City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today.  The pattern is now all too familiar:  the City pays vast sums of money to resolve cases where New Yorkers' constitutional rights have been violated, while the NYPD does nothing to financially incentivize its officers to change their behavior, and fails to investigate or address the underlying causes of such violations.

---

Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change," March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.

[5] *Id.*

[6] *Id.*

[7] *Id.*

**THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS – SUCH AS THE ONE PLAINTIFF WAS SUBJECTED TO – THROUGH ITS USE OF ARREST QUOTAS**

64. The City has also been alerted to the regular use of stop, question, and frisk by its police officers, which disproportionately target people of color, despite the lack criminal evidence that such police intrusion actually produce, and despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

65. Even as the use of stop, question, and frisk has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

66. According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times. Of the people stopped: 38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[8]

67. The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people. For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[9] The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not

---

[8] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).
[9] *See* NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

recall ever having arraigned a white defendant on an open container charge.[10]

68. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of innocent New Yorker's civil rights.[11]

69. The City is aware that performance goals and quota imposed on officers leads to unconstitutional detentions, yet has not taken adequate or sufficient steps to end the use of such quotas.

70. The City's inability to prevent its officers from abusing the stop and frisk policy is emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority. Such failures have led to further abuse of authority by police officers, including the incident underlying Plaintiff's Complaint.

71. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. As the Honorable Jack Weinstein, United States District Court Judge for the Eastern District of New York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department— there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

---

[10] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).
[11] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

72. The use of arrest quotas, and more generally on the requirement that officer's "clear" cases provides officers a compelling motivation to make arrests, regardless of the existence of probable cause. For example, here Det. D'Souza was assigned investigation of this matter, but was unable to arrange for the arrest of the New Jersey man who he knew to be the perpetrator. He was therefore force to close this case repeatedly, only to have the matter reopened and reassigned to him every 60 days. It is unsurprising that officers faced with these pressures to resolve cases would therefore make arrests which were not justified by the facts. The City's policies therefore led to the decision to arrest plaintiff without probable cause.

73. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.  Despite such notice, the City has failed to take corrective action.  This failure and these policies caused the officers in the present case to violate plaintiff's civil rights, without fear of reprisal.

74. Plaintiff has been damaged as a result of the City's deliberate indifference.

**WHEREFORE**, plaintiff demands judgments against the defendants, jointly and severally, as follows:

A.      In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

B.      Awarding plaintiff punitive damages in an amount to be determined by a jury;

C.      Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D.      Granting such other and further relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

DATED:      Feb 11, 2019
             Brooklyn, New York

Respectfully yours,

By: Nicholas Mindicino, Esq.
Stoll, Glickman & Bellina, LLP
Attorneys for Plaintiff
300 Cadman Plz. W. 12th Floor
Brooklyn, NY  11201
(718) 852-3710
(718) 852-3586
NMindicino@stollglickman.com

TO:    City of New York
       Corporation Counsel Office
       100 Church Street
       New York, NY  10007

       Detective Keith D'Souza, Shield No. 02106,

       Detective Elizabeth Delarosa, Shield No. 05742,

       Detective Michael Carreras, Shield No. 01432,

       Detective Victor Sadarangani, Shield No. 24066,

       Detective Andrew Cerase, Shield No. 18028,

       Detective Brian Macarthur, Shield No. 02073